James M. MacFARLANE, Appellant,

v.

Ella T. GRASSO, et al., Appellees.

No. 48, Docket 82–6052.

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1982.

Decided Dec. 14, 1982.

Eddi Z. Zyko, P.C., Waterbury, Conn., for appellant.

Michael J. Nardotti, Jr., Major, JAGC, Military Personnel Branch, Litigation Div., Washington, D.C. (Alan H. Nevas, U.S. Atty., D. Conn., Frank H. Santoro, Asst. U.S. Atty., New Haven, Conn., of counsel), for federal appellees.

Cornelius F. Tuohy, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., State of Conn., Hartford, Conn., of counsel), for appellees, Grasso and Freund.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

James M. MacFarlane, a major in the United States Army Reserve and a former member of the Connecticut Army National Guard (CONNARNG), appeals from the January 28, 1982 judgment of the District Court for the District of Connecticut, Blumenfeld, J., dismissing his civil rights action against the Governor of Connecticut, the Adjutant General of CONNARNG, and the Secretary of the Army. MacFarlane contends that the state defendants denied him rights guaranteed by the First and Fourteenth Amendments and by state and federal law, in denying him an appointment as a stock control officer in CONNARNG. He alleges further that the Secretary of the Army violated the Constitution and federal statutes by failing appropriately to sanction the illegal practices of the state defendants. We agree with Judge Blumenfeld that MacFarlane has not stated a claim under the equal protection or due process clauses of the Fourteenth Amendment, or under state or federal statutes, and we affirm the dismissal of those claims. We also affirm, though not entirely for the reasons relied upon by Judge Blumenfeld, the dismissal of MacFarlane's claims against the Secretary of the Army. However, we believe that Judge Blumenfeld misread the complaint in dismissing MacFarlane's First Amendment claim. As we read the complaint, it does state a First Amendment claim against the state defendants. We therefore reverse the decision of the District Court, and remand the case for further proceedings, with respect to that claim and those defendants only.

Because this appeal is taken from a judgment of dismissal, we must accept as true statements of fact in the plaintiff's complaint. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

MacFarlane began his military career in 1958 when he enlisted in CONNARNG. That same year he graduated from CONNARNG's Officer Candidate School and was commissioned a second lieutenant. In 1959 MacFarlane went to Flight School and became a pilot while still a member of CONNARNG. In 1962 he transferred to the United States Army Reserve and joined Air America, a civilian organization closely connected to the United States military effort in Southeast Asia. As a member of Air America MacFarlane flew in support of United States military and surveillance operations in Vietnam, Laos, and Cambodia. In 1967 MacFarlane transferred to the New York Army National Guard as a first lieutenant in the 42nd Aviation Company. In 1968 MacFarlane sought transfer to the 162nd Transportation Battalion of CONNARNG. The transfer was delayed because Major General Donald Walsh, then the Adjutant General of the state of Connecticut, erroneously believed that MacFarlane had "buzzed" a nuclear submarine at the New London, Connecticut submarine base. However, the transfer was accomplished and on or about September 9, 1968 MacFarlane rejoined CONNARNG. On September 24, 1969 MacFarlane received an Officer Efficiency Report (OER) which "un-

fairly" criticized his performance of his duties. Although MacFarlane appealed the OER through appropriate Army channels, at this time he transferred from CONNARNG into an aviation unit of the United States Army Reserve. Both CONNARNG and the Reserve unit based their aircraft and equipment at Brainard Field, near Hartford, Connecticut. During the period that MacFarlane flew for the Reserve from Brainard Field, CONNARNG's chief technician, John Gore, held him responsible for certain damage that had occurred to a CONNARNG hangar. As a result of Gore's report MacFarlane was relieved of flying status for one month. MacFarlane remained in the Army Reserve on active status until August 2, 1978 and advanced through promotions to the rank of major. He is presently assigned, in an inactive status, to the Army Personnel and Administrative Center in St. Louis, Missouri.

On February 7, 1980 MacFarlane wrote to Connecticut Governor Ella Grasso to complain of the 1969 OER and the allegation that he had buzzed a submarine in 1968. Governor Grasso referred MacFarlane's letter to the Adjutant General for the state of Connecticut, Major General John Freund. In several letters to General Freund, MacFarlane complained of the treatment he had received from the CONNARNG technician at Brainard Field, John Gore. General Freund reviewed MacFarlane's file and assured him that the buzzing and hangar incidents had not been recorded on his record and that his 1969 OER, while far from outstanding, was also not poor. However, the General informed MacFarlane that the passage of time made it impossible for him independently to review the accuracy of the OER. Dissatisfied with this response, MacFarlane on June 1, 1980 wrote to the Inspector General of the First United States Army and complained that General Freund did not appear to be seriously interested in addressing his charges. On June 2, 1980 MacFarlane wrote a similar letter of complaint to the Office of the Army Inspector General in Washington, D.C. He also made an oral complaint to an official of the National Guard Bureau in Washington.

On June 17, 1980, MacFarlane applied for an open position as stock control officer in the Aviation Classification Repair Activity Depot (AVCRAD) battalion of CONNARNG at Groton, Connecticut. The commanding officer of the CONNARNG depot forwarded MacFarlane's application to the office of the Adjutant General. According to MacFarlane, on June 24, 1980, shortly after receiving MacFarlane's application, Adjutant General Freund, John Gore (then a Brigadier General and the Assistant Adjutant General for the state of Connecticut), and several other officers held an unscheduled meeting and filled all of the vacant positions at the Groton depot. That same day the commanding officer of the Groton depot informed MacFarlane by letter that he would not be appointed as stock control officer because CONNARNG followed a policy of promoting from within. MacFarlane complained of the rejection to the Inspector General of the First Army, but to no avail.

On November 26, 1980 MacFarlane filed a complaint in the District Court for the District of Connecticut, naming as defendants the Governor of Connecticut, Ella Grasso; the Connecticut Adjutant General, Major General John Freund; the Secretary of the Army, Clifford Alexander, Jr.; and the Chief of the National Guard Bureau, Lieutenant General La Vern E. Weber. MacFarlane alleged that the state defendants violated federal statutes, and violated his rights to due process and freedom of speech, by denying him the position at Groton. He alleged that the federal defendants had committed independent statutory and constitutional violations by continuing to fund CONNARNG after CONNARNG violated his rights. On May 13, 1981 Judge Blumenfeld granted the defendants' motions to dismiss for failure to state a claim.

On June 5, 1981 MacFarlane filed a motion to vacate the judgment of dismissal, entered on May 26, 1981, and for leave to amend his complaint. Judge Blumenfeld granted this motion on August 12, 1981 and that same day MacFarlane filed an amended complaint. The amended complaint

named as defendants the four officials named in the original complaint[1] and repeated MacFarlane's statutory and freedom of speech claims. The amended complaint additionally alleged that CONNARNG's internal promotion policy violated federal laws and regulations and the due process and equal protection clauses of the Fourteenth Amendment. As relief MacFarlane requested the issuance of a writ of mandamus to the state defendants directing either his appointment as stock control officer or a fair hearing on his application, and injunctions prohibiting CONNARNG from using a policy of internal promotion and the Secretary of the Army from funding CONNARNG until CONNARNG came into compliance with the law. He also requested damages from the state defendants, including backpay, attorney fees, and $500,000 punitive damages. On January 27, 1982 Judge Blumenfeld issued a decision dismissing the amended complaint. The Judge ruled that MacFarlane had failed to identify any statutes or regulations prohibiting a state National Guard from adopting a policy of internal promotion. He rejected MacFarlane's due process and equal protection claims, finding that MacFarlane did not have an entitlement to the CONNARNG position and that the internal promotion policy was rationally related to Connecticut's legitimate interest in maintaining morale within CONNARNG. Relying upon *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Judge held that MacFarlane had not stated a First Amendment claim because under its internal promotion policy CONNARNG would have rejected MacFarlane's application without regard to his speech. The Judge noted that MacFarlane did not allege that CONNARNG had adopted its internal promotion policy in retaliation for his speech. MacFarlane now appeals from the judgment of dismissal entered on January 28, 1982.

We are well aware that the judiciary must be careful, on appropriate occasions, to defer to the decisions of military authorities. *See Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). However, we see nothing to suggest that judicial review of MacFarlane's claims against the state and federal defendants would measurably impair military functions or would invade provinces exclusively reserved to military discretion or expertise. We therefore proceed to consider in order the due process, statutory, equal protection, and First Amendment claims brought against the state defendants under 42 U.S.C. § 1983 (1976), and the derivative claims against the federal defendant.

MacFarlane claims that under federal law he had an entitlement to the CONNARNG vacancy. He accordingly argues that CONNARNG's rejection of his application without a hearing denied him due process. This claim is without merit.

■ The requirements of procedural due process apply only where there has been a deprivation of an interest encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Ordinarily, an applicant for government employment does not have a property interest in the position he seeks. To have a property interest in a government position, the applicant "clearly must have more than an abstract need or desire for it. He must

---

1. Suit was filed against each of the individual defendants in his or her personal and official capacities. However, none of the four original defendants remains a defendant in an official capacity. Governor Ella Grasso died on February 5, 1981 and was succeeded as governor by William O'Neill. Major General John Freund retired on April 23, 1981 and was succeeded as Connecticut's Adjutant General by Major General John Gore. Clifford Alexander, Jr. resigned his position on January 19, 1981 and on January 30, 1981 was succeeded as Secretary of the Army by John Marsh. The Chief of the National Guard Bureau, Lieutenant General La Vern E. Weber, has not appeared in this action but as an official subordinate to the Secretary of the Army, *see* 10 U.S.C. § 3015(a) (1976), has apparently throughout the action been represented by the Secretary. Under Fed.R.Civ.P. 25(d)(1) the successor of each of the first three named defendants has automatically become a defendant in his official capacity in this action.

have more than a unilateral expectation of it. He must, instead, have a *legitimate* claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added). Property interests are created by sources of law outside the Constitution; MacFarlane claims that in his case federal statutes and policies applicable to the state National Guards gave him a "legitimate claim of entitlement" to the job with CONNARNG. We conclude, however, that the statutes and policies cited by MacFarlane did not create an entitlement.

In support of his due process claim MacFarlane directs this court's attention to 32 C.F.R. § 564.3 (1981), paragraph 2–9 of National Guard Regulation 600–100 (1980), and Conn.Gen.Stat. §§ 27–14 and 27–49 (West 1975). Section 564.3 of 32 C.F.R. and National Guard Regulation 600–100 define the situations in which an officer of a state Army National Guard will be federally recognized under 10 U.S.C. §§ 591 & 3351 as an officer of equivalent rank in the United States Army Reserve with assignment to the Army National Guard of the United States (ARNGUS). Under subsection (h)(1) of 32 C.F.R. § 564.3, and paragraph 2–9(a) of National Guard Regulation 600–100, an individual who is already an officer of the Army Reserve, and who is appointed to be an officer of a state Army National Guard, may be federally recognized as an officer of ARNGUS. Specified classes of persons who are not presently officers of the Army Reserve also may qualify for federal recognition under 32 C.F.R. § 564.3 and National Guard Regulation 600–100. Section 27–14 of the Connecticut General Statutes provides that Connecticut's governor is to be the commander-in-chief of the state National Guard. Section 27–49 requires the governor to appoint National Guard officers according to federal standards. In effect, section 27–49 requires the governor to appoint CONNARNG officers from among those persons who will qualify for federal recognition as officers of ARNGUS. It is obvious that these statutes and regulations, taken together, did not entitle MacFarlane to the CONNARNG vacancy. Instead, they merely established his eligibility to be con-

sidered for the job, as a person who would qualify for federal recognition if appointed.

MacFarlane also bases his claim to an entitlement on the "Total Force" program of the United States military. The "Total Force" program seeks to maximize the effectiveness of the United States armed forces by treating the various branches of the service, for planning purposes, as an integrated whole. The program is in part intended to ensure that Reserve and National Guard forces will have the personnel, training, and equipment they need to serve effectively in a crisis. MacFarlane argues that because the Total Force program seeks to enhance the readiness of the United States military, it requires commanders to fill vacancies with the best available applicants. He argues that he was the best qualified applicant for the CONNARNG vacancy, and that he therefore had an entitlement to the job. MacFarlane has not, however, pointed to any element of the Total Force program which requires military commanders to exercise in any particular manner or in favor of any particular applicant the discretion allowed them in appointments. In this situation, MacFarlane's due process claim under the Total Force program amounts only to an unreviewable allegation that CONNARNG failed to fill a vacancy with the most qualified applicant. We conclude, therefore, that neither the Total Force program nor federal statutes entitled MacFarlane to the CONNARNG position. This ruling is consistent with previous decisions holding that National Guard officers and enlisted men do not have an interest in their positions protected by the due process clause. *See Walker v. Alexander,* 569 F.2d 291 (5th Cir.1978); *Fredericks v. Vartanian,* 529 F.Supp. 264 (D.Mass. 1981). *See also NeSmith v. Fulton,* 615 F.2d 196, 203 (5th Cir.1980).

■ MacFarlane claims that the Total Force program and 10 U.S.C. § 277 (1976) prohibit CONNARNG from employing a policy of internal promotion. MacFarlane again fails to identify any specific element of the Total Force program that supports his claim. We are not convinced by his

argument that a policy of internal promotion is invalid because it may conflict with the Total Force program's goal of enhanced readiness. Instead, we agree with Judge Blumenfeld that "(a) general policy of integrating the various national guards with the active and reserve armed forces in the event of a national mobilization is not incompatible with the practice of the Connecticut National Guard to promote its own officers in order to maintain the morale of the unit." We also conclude that 10 U.S.C. § 277 does not prohibit CONNARNG from employing a policy of internal promotion. That statute prohibits the United States armed forces from discriminating between reserves and regulars in the administration of laws that apply to both. CONNARNG, however, as a state National Guard, is governed not by Title 10, but by Title 32, of the United States Code. Whether or not § 277 prohibits units of the regular Army from adopting a policy of internal promotion, it does not proscribe CONNARNG's policy.

▉ MacFarlane also challenges CONNARNG's internal promotion policy as a denial of equal protection. CONNARNG's policy clearly does not discriminate on the basis of a suspect classification. It cannot be said that the class of all applicants who are not currently members of CONNARNG has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973). Nor does the CONNARNG policy implicate any fundamental right. It follows that the CONNARNG policy is valid, for purposes of the equal protection clause, if it is rationally related to a legitimate governmental interest. We are satisfied that a policy of internal promotion is rationally related to Connecticut's legitimate interest in maintaining morale within its military units.

▉ In his final claim against the state defendants MacFarlane alleges that CON-NARNG violated his First Amendment right to freedom of speech by denying him the job as stock control officer. He alleges that CONNARNG's commanders rejected his application in retaliation for his complaints both within and outside the organization. It is settled that government employment may not be denied an applicant because of the applicant's exercise of his right of free speech. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) and cases cited therein. This rule applies whether or not the applicant has a contractual or statutory claim to the job. *Id.* at 597–98, 92 S.Ct. at 2697–98. Thus if an applicant demonstrates that his protected speech played a substantial role in the employer's decision to reject his application, he is entitled to relief unless the employer demonstrates by a preponderance of the evidence that the application would have been rejected even in the absence of the speech. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). These rules of law require us to consider two questions in analyzing MacFarlane's claim: First, whether MacFarlane's criticisms of the CONNARNG officers constituted protected speech, and second, whether the District Court properly took note of CONNARNG's internal promotion policy in holding that a First Amendment claim had not been stated.

▉ An individual does not forfeit his right to free speech by accepting government employment. First Amendment protection may extend not only to public expressions by a government employee, but also to an employee's private statements to his superiors. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). At the same time, not all speech by a government employee is constitutionally protected. Instead, to determine whether an employee's speech is protected, a court must strike "a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency

of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Although the balance between these interests must be struck according to the facts of each particular case, the Supreme Court has identified certain factors which usually should be considered. These include the effect of the employee's speech on the employer's ability to maintain discipline and harmonious working relationships; whether the employee's speech adversely affected a working relationship in which personal loyalty and confidence were especially required; and whether the employee's statements impeded the proper performance of his duties or interfered with the regular operation of the employing agency. *Pickering,* 391 U.S. at 569–70 & 572–73, 88 S.Ct. at 1736–37. The content of the speech should be considered; statements on matters of public concern are entitled to greater protection than are statements made solely to promote the employee's own interests. *Cf. Id.,* 391 U.S. at 568, 88 S.Ct. at 1734; *see Foster v. Ripley,* 207 U.S.App.D.C. 217, 645 F.2d 1142, 1148 (1981). Finally, where an employee makes his statements privately, the manner, time, and place in which the statements are delivered may affect the protected character of the speech. *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979).

■ The District Court did not consider whether under these standards MacFarlane's criticism of the CONNARNG officers constituted protected speech. We note, however, that the need for personal loyalty and confidence may be especially great in a military command, and that not all speech which is protected in civilian life is protected within the military. *See Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980); *Parker v. Levy,* 417 U.S. 733, 758–59, 94 S.Ct. 2547, 2562–63, 41 L.Ed.2d 439 (1974). Because we have determined, for reasons stated below, that MacFarlane's First Amendment claim must be remanded, application of these and other factors to MacFarlane's statements will be a task in the first instance for the District Court. Throughout the remainder of this opinion we will assume, without deciding, that MacFarlane's speech was protected.

■ As previously noted, under *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), even if a plaintiff demonstrates that protected speech played a substantial role in the rejection of his application, the defendant is entitled to prevail if he demonstrates by a preponderance of the evidence that the applicant would have been rejected even in the absence of the protected speech. Judge Blumenfeld held that CONNARNG was entitled to prevail under *Mt. Healthy* because its policy of internal promotion required rejection of MacFarlane's application without regard to his speech. We have previously determined that CONNARNG validly can employ a policy of internal promotion. We therefore would affirm Judge Blumenfeld's ruling if we believed that the policy was properly before the Judge on the motion to dismiss the First Amendment claim. We conclude, however, that the policy should not have been considered.

Judge Blumenfeld ruled that MacFarlane's amended complaint conceded the existence of the CONNARNG policy. We agree that MacFarlane has conceded the existence of the policy for some purposes, but do not agree that the concession is total. The amended complaint is divided into six causes of action, the first five of which are directed against the state defendants. Of those five causes of action each of the last three either complains of the promotion policy or concedes its existence. However, MacFarlane's first two causes of action, which charge the state defendants with statutory and constitutional violations, including First Amendment violations, do not mention the policy or concede that it exists. Although the causes of action are not explicitly pleaded in the alternative, we believe that the division of the amended complaint into six clearly separated causes of action, each of which incorporates the allegations of its predecessor, falls within the latitude allowed by Fed.R.Civ.P. 8(e)(2) for

alternative and hypothetical pleading. Thus the amended complaint, fairly read, concedes the existence of the promotion policy only to the extent necessary to challenge its legality. No concession is made for purposes of the First Amendment claim. Although the state defendants affirmed in their briefs and at oral argument on the motion to dismiss that the policy existed, and that it was applied to MacFarlane's application, it is axiomatic that the district court could not consider the defendants' statements of fact in assessing the sufficiency of the complaint. *Danner v. Moore,* 306 F.Supp. 433, 436 n. 2 (W.D.Pa.1969). We therefore conclude that the existence and application of CONNARNG's internal promotion policy are, with respect to the First Amendment claim, questions of fact on which MacFarlane was denied the opportunity to present his proofs. We reverse the dismissal of the First Amendment claim against the state defendants and remand that much of the case for further proceedings.

Finally, we must consider whether MacFarlane has stated a claim against the Secretary of the Army. Obviously, to the extent that we have affirmed the dismissal of MacFarlane's claims against the state defendants, the dismissal of the claim against the Secretary is also affirmed. Because, however, we hold that MacFarlane has stated a First Amendment claim against the state defendants, we must decide whether MacFarlane's First Amendment allegations also support a claim against the Secretary.

▆▆▆▆ The Secretary argues that under the doctrine of sovereign immunity we do not have jurisdiction of MacFarlane's claim. Sovereign immunity does not bar a suit which seeks to prevent an official of the United States from acting in excess of his statutory authority, from exercising his statutory authority in an unconstitutional manner, or from exercising statutory authority which is itself unconstitutional. *See Dugan v. Rank,* 372 U.S. 609, 621–22, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689–90, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949), *Smith v. Grimm,* 534 F.2d 1346, 1351 n. 6 (9th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Leonhard v. Mitchell,* 473 F.2d 709, 712 n. 2 (2d Cir.), *cert. denied, sub nom. Leonhard v. Richardson,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973); *Ragland v. Mueller,* 460 F.2d 1196, 1197 (5th Cir.1972). MacFarlane's complaint alleges that federal statutes and the Constitution obligate the Secretary to terminate funding to a state National Guard that commits constitutional violations, and that the Secretary, though aware of CONNARNG's violation of his rights, has continued to fund CONNARNG. He requests the court to enjoin the Secretary from funding CONNARNG until CONNARNG desists from its illegal practices and redresses its violations of his rights. MacFarlane thus requests this court to enjoin a federal official to perform a duty allegedly imposed by the Constitution and federal laws. MacFarlane's action raises a federal question over which we have jurisdiction under 28 U.S.C. § 1331 (1976), and is not barred by sovereign immunity.[2]

▆▆▆▆ There remains the question whether MacFarlane has stated a valid

---

**2.** Several of the Courts of Appeals have concluded that the 1976 amendments to 5 U.S.C. § 702 (1976) waived the defense of sovereign immunity in injunctive actions brought under 28 U.S.C. § 1331 (1976). *See Beller v. Middendorf,* 632 F.2d 788, 796–97 (9th Cir.1980), *cert. denied sub nom. Beller v. Lehman,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981); *Sheehan v. Army and Air Force Exchange Serv.,* 619 F.2d 1132, 1139 (5th Cir.1980), *rev'd on other grounds,* —— U.S. ——, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.), *cert.*

*denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). This Circuit, however, has stated a contrary view. *See Watson v. Blumenthal,* 586 F.2d 925, 931–32 (2d Cir.1978) (Section 702 does not waive sovereign immunity for purposes of § 1331). We have concluded that independent of § 702 the Secretary cannot raise a defense of sovereign immunity. For that reason, and because neither MacFarlane nor the Secretary has argued the significance of § 702, we decline to consider the application of *Watson* to this case or the relationship between sections 702 and 1331.

claim against the Secretary. We affirm the dismissal of the claim against the Secretary because the specific allegations of MacFarlane's complaint do not support his claim of violation of duty. MacFarlane alleges that National Guard Regulation 600–100 (1980), 10 U.S.C. § 277 (1976), and the Total Force program obligated the Secretary to terminate CONNARNG's funding. However, MacFarlane has not identified, and we have not found, any provision in these statutes, regulations, and policies which imposes a mandatory restriction or qualification on the Secretary's duty under 32 U.S.C. §§ 106, 107 (1976) to fund the state Army National Guards.[3] His allegation of a constitutional violation is similarly insufficient as a matter of law. Read in the light most favorable to MacFarlane, the complaint may allege that the Secretary participated in CONNARNG's First Amendment violation and thereby became obligated to terminate CONNARNG's funding as a means of redressing his own violation of law. If, however, the complaint seeks to make this claim, necessary factual allegations are missing. MacFarlane has not alleged that the Secretary instigated or expressly approved CONNARNG's alleged violation of his First Amendment rights. He has not alleged that the Secretary played a direct role in the selection of CONNARNG's new stock control officer.[4] He has not alleged that the Secretary has adopted a general policy of condoning the First Amendment violations of state National Guards. In sum, MacFarlane's First Amendment allegations do not support a claim against the Secretary. The dismissal of the claim against the Secretary is affirmed.

The judgment of dismissal is reversed and remanded with respect to the First

---

3. There is a statutory provision under which federal funding of a state National Guard can be terminated. 32 U.S.C. § 108 (1976) provides:

> If, within a time to be fixed by the President, a State does not comply with or enforce a requirement of, or regulation prescribed under, this title its National Guard is barred, wholly or partly as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law.

MacFarlane cannot rely on this statute for two reasons. First, his complaint fails to allege any conduct on the part of CONNARNG which constitutes a violation of any "requirement of, or regulation prescribed under," Title 32. Second, the President's power to terminate federal funding under § 108 is discretionary. Proof of Title 32 violations would not, under the circumstances of this case, obligate the Secretary to terminate CONNARNG's funding under § 108.

4. Had such an allegation been made, it is unlikely that it could have been proven. The constitutional, statutory, and regulatory provisions which govern the appointment of officers to the state National Guards indicate that such appointments are a function of the states, and not of the federal government.

Although Article I, Section 8, Clause 16 of the United States Constitution authorizes the Congress "(t)o provide for organizing, arming, and disciplining" the National Guard, the same clause reserves to the states the power to appoint *the officers of the Guard.* The United States has not attempted directly to control the appointing power. The fact that most, if not all, states voluntarily have chosen to appoint Army National Guard officers according to the standards of National Guard Regulation 600–100 (1980) and 32 C.F.R. §§ 564.2–564.5 (1981) in order to qualify their units for federal recognition and funding does not mean that federal action is present in the appointment of individual officers. Instead, as the federal regulations recognize, the actual selection and appointment of Army National Guard officers is solely a state responsibility. *See* paragraph 2–2(a) of National Guard Regulation 600–100 (1980) ("The appointment of officers in the ARNG is a function of the State concerned, as distinguished from the Federal recognition of such appointment."); 32 C.F.R. § 564.2(a)(2) (1981) ("Upon appointment in the Army National Guard of a State ... an individual has a State status under which he can function. Such individual acquires a Federal status when he is federally recognized and appointed as a Reserve of the Army.") *See also Zitser v. Walsh,* 352 F.Supp. 438, 440 (D.Conn.1972) ("One may be a member of the National Guard of a state without receiving federal recognition, but never the reverse."), and paragraph 4–1 of Regulation 600–100 ("The assignment and transfer of officers is a function of the State concerned.") When not in the active service of the United States, CONNARNG is under the command of the governor of Connecticut, *see* Conn.Gen. Stat. § 27–14 (West 1975), who administers CONNARNG through the state adjutant general. *See* Conn.Gen.Stat. § 27–20 (West 1975). *See also* 10 U.S.C. § 3079 (1976). It is obvious that under these provisions the Secretary of the Army ordinarily does not play a direct role in the appointment of officers in CONNARNG.

Amendment claim against the state defendants; in all other respects the judgment is affirmed.